Carole KNEELAND and Belo Broadcasting Corp., Plaintiffs–Appellees,

and

A.H. Belo Corp., d/b/a The Dallas Morning News, The Times Herald Printing Co. and David Eden, Intervenors–Appellees, Cross–Appellants,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, and Southwest Athletic Conference, Defendant–Appellants, Cross–Appellees.

No. 86–1825.

United States Court of Appeals, Fifth Circuit.

July 26, 1988.

Rehearing and Rehearing En Banc Denied Aug. 25, 1988.

---

Jack Balagia, Jr., James R. Raup, McGinnis, Lochridge & Kilgore, Austin, Tex., for Kneeland.

William D. Sims, Jr., Paul C. Watler, David B. Dyer, Dallas, Tex., for A.H. Belo Corp.

Before THORNBERRY, POLITZ and WILLIAMS, Circuit Judges.

POLITZ, Circuit Judge:

The essential question posited on this appeal is whether the National Collegiate Athletic Association (NCAA) and the Southwest Athletic Conference (SWC) are subject to the Texas Open Records Act, Tex.Rev.Civ.Stat.Ann. art. 6252–17a (Vernon Supp.1988). The district court found that the NCAA and SWC received public funds and were governmental bodies within the meaning of the Act. It further found no validity to constitutional claims, asserted statutory exemptions, and a claimed tort-law bar to application of the Act.[1] We agree with the district court that the funds involved are public funds, but disagree that the NCAA and SWC are governmental bodies. So concluding, we reverse.

## BACKGROUND

The facts are set forth fully in the district court opinions reported in 650 F.Supp. at pages 1047, 1064 and 1076. Some are discussed in detail herein. We begin by noting that the genesis of this litigation was a football recruiting scandal at Southern Methodist University, Dallas, Texas. Kneeland, a reporter for the Dallas Morning News, A.H. Belo Corporation, d/b/a The Dallas Morning News, The Times Herald, and David Eden, invoked the Act and sought disclosure of the data developed in the investigations by the NCAA and SWC.

Robert M. Roller, Katheyn E. Allen, George H. Gangwere, Graves, Dougherty, Hearon & Moody, Austin, Tex., for National Collegiate Athletic Ass'n.

Robert F. Middleton, O. Luke Davis, III, Baker, Smith & Mills, Dallas, Tex., for Southwest Athletic Conference.

Jack Pew, Jr., Charles L. Babcock, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., for Times Herald Printing and David Eden.

---

1. The trial court handled the matter in three stages, and its decision is so reported. *Kneeland v. NCAA*, 650 F.Supp. 1047 (W.D.Tex.1986) (dismissing the 42 U.S.C. § 1983 claims and holding that the NCAA and SWC received public funds and were governmental bodies subject to the Act, and that the information sought was public information); *Kneeland v. NCAA*, 650 F.Supp. 1064 (W.D.Tex.1986) (denying all defenses except possible statutory exemptions); and *Kneeland v. NCAA*, 650 F.Supp. 1076 (W.D. Tex.1986) (ruling on exemptions and granting relief to complainants).

When their requests were denied, complainants petitioned the Texas state court for a mandamus commanding disclosure. After removal to federal court because of the § 1983 claims, and a bifurcated trial, the district court held that the NCAA and the SWC were governmental bodies subject to the Act. The district court based its resolution on findings and conclusions about the organization and funding of the NCAA and SWC which we briefly examine.

NCAA

The NCAA is a private association composed of public and private colleges and universities from across the United States. There are member institutions in every state, including four public universities in Texas. The SWC and other regional associations are also members. The NCAA is governed by a constitution, a set of bylaws, and extensive regulations, to which all members commit. The member institutions send delegates to national conventions. These delegates elect a council which, in turn, elects an executive committee which transacts the business of the association, including the collection of dues. In addition, the delegates elect multiple committees which are assigned either responsibilities for a particular sport or an overall function.

The NCAA derives its income from three sources: dues, assessments on television gross rights fees, and championship games and tournaments.

The NCAA receives a four percent assessment on the gross rights fees paid to members for nationally telecast conference football games. Revenue generated by this assessment is used to fund the NCAA's post-graduate scholarship programs and football related services.

The largest part of NCAA revenues comes from championship events.[2] The hosting members receive specifically listed expenses, and a percentage, 10 to 15 percent, of the gross receipts from the events, including concessions. The net is remitted to the NCAA. A portion thereof is used to defray the travel and per diem expenses of the visiting teams.

SWC

The SWC is a non-profit association composed of nine member-universities, including four Texas public institutions. It is governed by a constitution and bylaws. Its revenues are generated by gate receipts and television fee assessments. Under the SWC bylaws, each member remits 50% of its share of the receipts from non-conference regionally or nationally televised games. Teams in conference games share 30%; the remainder is remitted to the SWC. Payments previously were directed to the universities. Since initiation of this litigation the SWC has requested that the television networks send the payments directly to the SWC, which deducts its percentage and forwards the remainder to its members. Each year the SWC sets aside its estimated expenses for the coming year and it then makes an equal distribution of the excess funds to its nine member-universities.

## ANALYSIS

### A. *Public Funds*

The Act defines public funds as "funds of the State of Texas or any governmental subdivision thereof." Tex.Rev.Civ.Stat. Ann. art. 6252–17a, § 2(1)(F); (Vernon Supp.1988). Texas universities and colleges are created by the Texas Constitution and are subdivisions of the state. Our inquiry is whether the revenues remitted to the NCAA and the SWC by Texas public universities are public funds under the Act.

### 1. *NCAA*

The district court held that the sums paid by public schools to the NCAA in dues, assessments of television gross rights fees, and unreimbursed salaries and costs connected with championship events, were public funds. The court found that the athletic departments of Texas state universities were auxiliary enterprises, and funds

---

**2.** In 1985–86, the NCAA budget was $49,367,000. Championship events accounted for 84.8%— $41,863,210.

in their accounts were public funds belonging to the State of Texas. The court also held that under the holding of *Board of Regents of University of Oklahoma v. NCAA*, 546 F.Supp. 1276 (W.D.Okla.1982), *aff'd.*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed. 2d 70 (1984), football television rights are owned by universities; those belonging to public schools belong to the state and the revenues derived become state funds. The NCAA does not challenge either ruling. Rather, it contends that it is the exclusive owner of the championship events, and that the ultimate issue is whether its Enforcement Division, which developed and holds the investigative records at issue herein, is the recipient of public funds, assuming that there were unreimbursed costs and expenses, since the championship events are structured with a percentage component arrangement.

■ The evidence relative to the sources of the $1.5 million budget of the Enforcement Division is conflicting. The district court found that revenues from telecast assessments, as well as that derived from championship events, were used to fund all NCAA divisions, including enforcement. Considering the earmarking of assessments for "football related services," and the testimony by the NCAA comptroller that all funds were commingled, the tracing of specific funds to specific functions is not possible. The district court's factual finding that Enforcement Division funds came from all three revenue sources easily withstands a clearly erroneous challenge. Fed.R.Civ.P. 52(a). Accordingly, even if the costs of unreimbursed goods and services provided for championship events are not deemed public funds, it is still apparent that the Enforcement Division receives some public funds.

### 2. *SWC*

■ The SWC Bylaws are part of the contractual arrangement between member-schools and the SWC. Bylaw 9.04(A) requires members to tender one-half of their receipts from non-conference football games, while Bylaw 9.05 entitles the SWC to 70% of the receipts of conference games. In addition, the SWC receives television gross rights fees assessments. As noted, after deducting anticipated expenses the SWC annually returns these funds in equal portions to its nine members.

SWC maintains that the monies received from gate receipts and television broadcasts belong to it, that its members merely act as collecting and disbursing agents. The district court rejected this argument. The SWC now reurges it, citing *A.H. Belo v. Southern Methodist University*, 734 S.W.2d 720 (Tex.App.1987—error denied May 18, 1988). In that case the Texas intermediate appellate court held that the funds annually distributed to the four private-member universities (Southern Methodist University, Texas Christian University, Baylor and Rice) were not public funds, and that by receipt thereof, the four universities did not become governmental bodies.

SWC and the NCAA would have us read this decision as authority for the proposition that television broadcast revenues and fee assessments paid by the Texas public institutions to the SWC are private funds held in trust by the members for the SWC. The same argument would apply to the four percent gross rights fee assessment imposed by the NCAA Bylaw 8–2–(c). The argument is based on the fact that gate receipts and broadcast fees received by athletic departments are considered auxiliary or local funds which need not be deposited in the state treasury. Tex.Ed.Code Ann. § 51.002. However, guiding jurisprudence and persuasive opinions[3] of the Texas Attorney General, issued over an extended period of time, convince us that these funds are public funds.

Property of various kinds comprise public funds. *Goggans v. Simmons*, 319 S.W. 2d 442 (Tex.Civ.App.1958) (*writ ref'd n.r. e.*). Property includes obligations, rights, and other intangibles. *Womack v. Wom-*

---

**3.** *See* for example, Tex. Att'y Gen. No. JM–710 (1987); JM–575 (1986); ORD–268 (1981); MW– 25 (1979); H–456 (1974); and O–1662 (1940).

*ack*, 141 Tex. 299, 172 S.W.2d 307 (1943). The right inherent in permitting the telecast of a football game is a property right belonging to the universities. *Board of Regents of University of Oklahoma v. NCAA, supra.* All funds belonging to the University of Texas are state funds. *Walsh v. University of Texas*, 169 S.W.2d 993 (Tex.Civ.App.1942) (*writ ref'd* ). And as opined by the Texas Attorney General in the footnoted opinions, an obligation to pay money to a state university and an assignment of a right to collect money owed to a state university both constitute public funds. Further, all revenues received by state colleges and universities, except for trust funds, are state funds. Finally, the receipt of income may not be shortstopped and its character changed by an anticipatory assignment. *Lucas v. Earl*, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930). Nor may such an assignment create a trust. *McCord v. Fort Worth National Bank*, 275 S.W.2d 717 (Tex.Civ.App.1955) (*writ ref'd n.r.e.*).

We agree with the district court that the gate receipts and television revenue paid to the NCAA and SWC are public funds.

### B. *Governmental Bodies*

Section 2(1)(F) of the Act, Tex.Rev.Civ. Stat.Ann. art. 6252–17a, § 2(1)(F), contains the pertinent language defining a governmental body. It defines a governmental body as including

the part, section or portion of every organization, corporation, commission, committee, institution, or agency which is supported in whole or in part *by public funds*.... (emphasis added).

Since we have determined that the monies involved are public funds, we must now resolve whether those funds constitute the "support" envisioned by the Act. It is in the resolution of this inquiry that we disagree with the trial court.

The usual deference paid to formal opinions of state attorneys general is accentuated in this case because the Texas Legislature has formally invited its Attorney General to interpret the Act when asked to do so. Tex.Rev.Civ.Stat.Ann. art. 6252–17a,

§ 7. The Texas Attorney General has concluded that the Act does not apply to "private persons or businesses simply because they provide specific goods or services under a contract with a government body." Tex. Att'y Gen. No. ORD–1 (1973) (a bank holding funds of a governmental body is not subject to the Act).

Finding no dispositive Texas jurisprudence on this issue, we closely examine the opinions of the Texas Attorney General. We find helpful signs, albeit mixed signals, in the opinions, which generally are fact-specific. We perceive three distinct patterns of analysis in opinions interpreting this aspect of the Act.

The opinions advise that an entity receiving public funds becomes a governmental body under the Act, unless its relationship with the government imposes "a specific and definite obligation ... to provide a measurable amount of service in exchange for a certain amount of money as would be expected in a typical arms-length contract for services between a vendor and purchaser." Tex. Att'y Gen. No. JM–821 (1987), *quoting* ORD–228 (1979). That same opinion informs that "a contract or relationship that involves public funds and that indicates a common purpose or objective or that creates an agency-type relationship between a private entity and a public entity will bring the private entity within the ... definition of a 'governmental body.' " Finally, that opinion, citing others, advises that some entities, such as volunteer fire departments, will be considered governmental bodies if they provide "services traditionally provided by governmental bodies."

When we attempt to apply these patterns of analysis to the facts at bar it is apparent that a tension is created. One may have no quarrel with the formulae, but the direction given is a mite uncertain. On the one hand, as we discuss in more detail, *infra*, the NCAA and SWC provide services to Texas public universities, but obviously not as specific or finitely measurable as done by a company which sells pencils or repaints buildings. On the other hand, there apparently is some common purpose or ob-

jective between the association and the universities, or they would not be drawn to each other, but there is no real identity of interest and neither may be considered the agent of the other. Only one of the patterns of analysis occasions no tension—neither the NCAA nor the SWC performs what may be considered traditional governmental functions.

A parsing of a few attorney general opinions illumines our way. In Tex. Att'y Gen. No. ORD–228 (1979) the Attorney General addressed a private, non-profit commission chartered to promote the interests of the Dallas-Fort Worth metropolitan area. Fort Worth paid the Commission $80,000 for three years. The contract obliged the Commission to "implement such new and innovative programs as will further its corporate objectives and common City's interests and activities." The Attorney General construed this charter as providing public funds for the general support of the Commission's activities, and subjected the Commission to the Act as a governmental body.

Similarly, a foundation formed to "render aid to [local] manufacturing and industrial enterprises," and to induce others to settle in the locale was deemed the recipient of an unrestricted grant. Tex. Att'y Gen. No. ORD–302 (1982). *See also,* Tex. Att'y Gen. No. MW–373 (1981).

Further, the Attorney General considered the proposed Gulf Star Conference to be a governmental body. Its constitution declared that one of its two stated purposes was to aid members to "incorporate intercollegiate athletics within their respective educational programs and [to] place and maintain such athletics under the same administrative and academic control as that which obtains in their other educational programs." No specific services were proposed. The Attorney General was of the view that funds provided for this purpose would constitute "general support ... rather than [be] attributable to specific payment for specific measurable services." Tex. Att'y Gen. No. JM–116 (1983).

On the other hand, the Attorney General found specific, measurable services prescribed in an agreement between Amarillo Medical Service (AMS) and Amarillo Hospital District. Under the contract, AMS was to provide emergency medical services, including ambulance service, to persons using the district's medical facilities. The Attorney General concluded that AMS was to perform specific duties for which it was to receive "each month a sum equal to the difference between cash receipts and approved operating expenditures of the ambulance service." Tex. Att'y Gen. No. ORD–343 (1982). This language was viewed as imposing an obligation to make specific payment for specific services.

### Application to the NCAA

■ The trial court, as noted, found three sources of monies paid to or for the benefit of the NCAA: dues, television fee assessments, and unreimbursed services and costs incurred by state universities in championship events. NCAA Bylaw 9–3–(a) provides for dues[4] to cover the direct costs of association publications, convention operations, establishment and maintenance of playing rules and compilation of statistics. The four percent gross rights fees assessments are prescribed by Bylaw 8–2–(c) to "fund the costs of the NCAA post-graduate scholarship program and football-related services of the NCAA." Executive Regulation 1, § 8 covers championship events. The district court found the language of Bylaws 8 and 9 to be "vague and amorphous." We are not inclined to share that characterization.

The NCAA operates through an extensive set of committees, the members of which are elected by the delegates at the annual convention. Electing committee members and formulating policy constitutes the primary business of the annual convention. The NCAA committee members receive travel expenses and a per diem allowance. Hence, public funds paid in

---

**4.** In 1984–85 dues ranged from $350 for conference members like the SWC, to $1400 for Division I schools.

dues are used to cover the expenses of the various committees.

The NCAA provides publications to and for the use and benefit of its members. For example, the NCAA guide for the college-bound student athlete is provided to members and a large number are sent to high schools across the country. The association also prepares and distributes television messages, such as those supporting higher education and opposing substance abuse and gambling.

The association provides a national statistics service, ranking teams and individual players, in football, baseball, basketball and softball. Members submit statistics which an appropriate committee verifies, analyzes, and distributes.

There are 16 committees dedicated to the formulation and constant refinement of the playing rules in the various sports, including rules for tournament and championship meets.

In each of these instances—conventions, publications, statistics, rules—member institutions receive specific services and benefits for funds paid. We are satisfied beyond peradventure that dues may not be considered unrestricted grants for the general support of the NCAA.

The same may be said for the television fees assessments. These support a scholarship program for college athletes. The record reflects just under one hundred $2,000 scholarships each year. Recipients are chosen by an NCAA committee from athletes nominated by member institutions.

Football-related services involve the collation and distribution of weekly football statistics, including best team offense, best team defense, best passers, best runners, etc. The association conducts an annual football preview week, bringing coaches to its Kansas City headquarters to meet with representatives of the national media. It produces television spots and films promoting college football. It underwrites start-up costs to encourage television and cable owners to become involved in filming athletic contests.

We are persuaded that these services provide sufficient metage for evaluating the exchange between the NCAA and its members. The dues and television fee assessments, which total less than one-sixth of the NCAA's total revenues, are not funds for the general support of the NCAA, but, rather, are an exchange for known, specific, and measurable services.

That leads, finally, to the claim that the various unreimbursed costs and services incurred by hosting members in championship events constituted general support of the NCAA with public funds. We are not persuaded. Assuming, *per arguendo*, that the incurring of these expenses constitutes the expenditure of public funds, we do not perceive this as other than consideration for specific, measurable services.

The association maintains an elaborate mechanism for formulating rules and procedures for the realization and enforcement of the policies and standards regarding student athletes adopted by the committees and the general assembly. These include, *inter alia*, academic requirements, recruiting safeguards, medical standards, student and team eligibility, and infractions. The Enforcement Division, staffed by 12 full-time and 25 part-time investigators, is involved in the enforcement program. The enforcement staff conducts interviews, collects documents and other data, and generally assists the members of the Committee on Infractions in their official investigations. The Division is charged with investigating any legitimate complaint that a member has failed to maintain academic or athletic standards, or has violated the association's constitution, bylaws, or regulations.

We are convinced that the members receive a *quid pro quo*, in sufficiently identifiable and measurable quantities of services, for any public fund expenditures inherent in hosting a championship event. Members individually and collectively have the benefit of the association's investigatory service and capability. We view this as sufficiently similar to the emergency medical services which passed muster in ORD–343.

In post-argument memos it is suggested that the recent Tex. Att'y Gen. No. ORD–821 (1987) establishes a new test and precludes any future reliance on Tex. Att'y Gen. No. ORD–343 (1982). We do not so comprehend the recent opinion, but read it, rather, as indicating that the manner of payment to the private entity is not to be the sole determinant. Public status is to turn on a consideration of that factor, along with consideration of the nature and other terms of the transaction. In revisiting ORD–343 in ORD–821, the Attorney General reweighed the underlying facts, went behind the transaction, and noted that the ambulance service could not make expenditures or personnel decisions without approval of the public body. It was because of this reappraisal of the facts that ORD–343 was called into question, not because of its exposition of the law, which is found in several other opinions of the Attorney General.

Finally, we cannot but observe that ORD–821 in part relies upon the case we are now reviewing.

### *Application to the SWC*

The SWC receives no dues; its income derives from television fee assessments and gate receipts from members. Its functions, in many instances, mirror and are a smaller version of the activities of the NCAA. The district court concluded that the SWC constitution and bylaws impose no obligation on the SWC to provide specific and measurable services. In addition, the district court considered the SWC to be virtually analogous to the Gulf Star Conference. We do not agree.

We view the SWC as markedly different from the Gulf Star Conference which, in its organic instrument, spoke of its common identity and purpose with its members, but identified no service designed to implement its purpose. That is not the case with the SWC. It provides a variety of services, which it trumpets that it will make available to members, including the promoting and administering of competitive awards, the training and scheduling of game officials, and the maintenance of relations with the news media.

We need not belabor the point. The SWC provides specific and gaugeable services which negate the general support element required for a governmental body designation.

Having concluded that the NCAA and SWC are not governmental bodies within the intendment of the Texas Open Records Act, we need not address the other issues raised on appeal.

The judgment of the district court is REVERSED.