# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00130-CV

**Greater Houston Partnership, Appellant**

**v.**

**Greg Abbott, Texas Attorney General; and Jim Jenkins, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT NO. D-1-GN-08-004378, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## O P I N I O N

In this case, we decide whether appellant Greater Houston Partnership (GHP) is "supported," in whole or in part, by public funds such that it is a "governmental body" subject to disclosure of information under the Texas Public Information Act (PIA). *See* Tex. Gov't Code Ann. § 552.003(1) (West 2012); *see generally* §§ 552.001–.353 (West 2012) (provisions of the PIA). GHP appeals from the district court's final judgment finding that GHP's contract with the City of Houston makes it a "governmental body" under the PIA and ordering GHP to disclose its 2007 and 2008 check registers to appellee Jim Jenkins, a member of the public who requested the information under the PIA. We will affirm the district court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

GHP is a Texas nonprofit corporation that describes itself as being akin to a chamber of commerce for a ten-county area centered around the City of Houston, Texas. Its

corporate purpose, as set forth in its articles of incorporation, is "the promotion of the economic stability and growth" of the Houston area, "maintaining a chamber of commerce for the purpose of promoting the public interest" in the Houston area, "acquiring, preserving, and disseminating valuable business information," and "generally promoting and assisting the improvement of commercial, industrial, agricultural, civic, and cultural affairs" of the Houston area. It describes its principal objective as "build[ing] regional economic prosperity," by "facilitat[ing] relocations and expansions in the Houston area; international outreach initiatives such as business development missions outside the U.S. and receiving foreign trade delegations; and strategic planning." According to GHP, it has an annual operating budget of approximately $11.7 million, the bulk of which comes from its 2,100 member companies, but it also receives public funds "to provide research, advertising, and economic development services to the City of Houston, Harris County, Port of Houston Authority, and The Woodlands." GHP maintains that those public funds "are payments for services rendered pursuant to contract." Of particular relevance to this case are two of GHP's contracts with the City of Houston, roughly covering the years 2007 and 2008, under which the City of Houston paid GHP $1.67 million in public funds. Under the terms of these contracts, GHP agrees "to improve the economic prosperity of Houston and the Houston Airport System" (HAS) by performing the following broadly stated scope of services:

1.   Identifying new business opportunities, securing economic incentives, and increasing outreach and recruitment activities to the region's targeted key industries to strengthen the City of Houston as a competitive place to do business.

2.   Conducting qualitative and quantitative research to assist HAS and the City of Houston's convention and visitor's bureau with their marketing efforts.

2

3.       Supporting and coordinating HAS on a comprehensive marketing program to develop new air routes and international business.

4.       Promoting HAS stories in international markets and highlighting HAS efforts to provide airports allowance for expansion and ease of transportation.

5.       Coordinating on matters of mutual interest before the United States Congress, federal agencies, the Texas State Legislature, and Texas agencies.

6.       Providing the City of Houston with full membership and exclusive benefits as a general partner of GHP.

7.       Providing the City of Houston with tables/tickets to various events.

In return for these services, the City of Houston paid GHP $196,250 per quarter, or $785,000 total, under the 2007 contract and $221,250 per quarter, or $885,000 total, under the 2008 contract.

In May 2008, Jenkins submitted a public-records request to GHP seeking a copy of GHP's check register for "all checks issued for the year 2007," including the number, date, payee, and amount for each check listed. GHP denied that it was a "governmental body" subject to the PIA such that it had to comply with Jenkins's request and referred the matter to appellant, the Texas Attorney General (Attorney General), whose office is responsible for processing challenges to open-records requests under the PIA. *See* Tex. Gov't Code Ann. § 552.306. GHP did not object to the breadth of Jenkins's request or seek to narrow its scope. The Attorney General's Open Records Division issued a letter ruling in February 2008 finding that GHP fell within the PIA's definition of "governmental body" and, as a result, that the information requested by Jenkins was subject to disclosure under the PIA as public information.[1]

---

[1] During the pendency of the district-court litigation discussed in more detail below, Jenkins filed an identical open-records request with the Attorney General's office for GHP's 2008 check register. This second request was eventually incorporated into the underlying litigation.

In response to the Attorney General's letter ruling, GHP filed this suit against the Attorney General seeking declaratory judgment that GHP is not a governmental body under the PIA, that the Attorney General has no jurisdiction over GHP, and that the Attorney General's letter ruling that GHP is a "governmental body" under the PIA is incorrect and without force. Jenkins, the requestor, subsequently intervened in the case. After a bench trial, the district court found that GHP received public funds from the City of Houston "to provide economic development and promotion services," that GHP and the City of Houston "shared the common purpose or objective of economic development and promotion," and that the contract between GHP and the City of Houston created an "agency-type relationship." Based on these findings, the district court concluded that GHP was supported by public funds, that GHP was a "governmental body" under the PIA, and that the requested information was "public information" subject to disclosure under the PIA. The district court then rendered a take-nothing judgment against GHP and ordered GHP to disclose the requested information to Jenkins. It is from this judgment that GHP appeals.

## ANALYSIS

GHP brings two issues on appeal. The first challenges the district court's finding that GHP is a "governmental body" required to disclose public records under the PIA. Specifically, GHP asserts that the district court "failed to follow traditional rules for construing GHP's contracts and erred in finding that GHP's 2007 and 2008 contracts with the City of Houston made GHP an 'agent' of the City of Houston that is 'supported' with public funds and whose internal check registers are subject to public disclosure." The district court should have focused, GHP asserts, on whether GHP, based on its contracts to provide services to the City of Houston, was "*supported* in whole or in part" by public funds. *See* Tex. Gov't Code Ann. § 552.003(1)(A)(xii) (emphasis added by GHP).

4

In its second issue, argued in the alternative, GHP contends that even if it was a "governmental body" subject to the PIA when the records at issue were created in 2007 and 2008, it was no longer a "governmental body" by the time the district court issued its final judgment because it had by that time renegotiated its contract with the City of Houston, and its new contract included provisions that modified the parties' relationship to, according to GHP, make it clear that GHP is not subject to the PIA. Thus, GHP argues, the court had no jurisdiction to order GHP to disclose its records.

**Standards of review**

Whether an entity is a "governmental body" under section 552.003 of the PIA is a matter of statutory construction that we review de novo. *Texas Ass'n of Appraisal Dists., Inc. v. Hart*, 382 S.W.3d 587, 590 (Tex. App.—Austin 2012, no pet.) (citing *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 357 (Tex. 2000) (noting that matters of statutory construction are legal questions, and specifically that whether information is subject to PIA is a question of law)); *see State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006) (holding that statutory construction is a matter of law, which is reviewed de novo). Our primary objective in statutory construction is to give effect to the Legislature's intent. *See Shumake*, 199 S.W.3d at 284. We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). We use statutory definitions provided. *See* Tex. Gov't Code Ann. § 311.011(b) (West 2005). Where statutory text is clear, it is determinative of legislative intent unless the plain meaning of the statute's words would produce an absurd result. *See Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009). Only when statutory text is susceptible to more than one reasonable interpretation is it appropriate to look beyond its language for assistance in determining legislative intent. *See In re Smith*, 333 S.W.3d 582, 586 (Tex. 2011). In construing the PIA we give due consideration to

5

Attorney General decisions, even though they are not binding, because the Legislature has directed the Attorney General to determine whether records must be disclosed pursuant to the PIA. *See* Tex. Gov't Code Ann. §§ 552.008(b-2), .301, .306 (requiring Attorney General to render decisions regarding PIA); *Hart*, 382 S.W.3d at 591 (citing *Abbott v. City of Corpus Christi*, 109 S.W.3d 113, 121 (Tex. App.—Austin 2003, no pet.); *Rainbow Grp. Ltd. v. Texas Emp't Comm'n*, 897 S.W.2d 946, 949 (Tex. App.—Austin 1995, writ denied)).

The Texas Legislature promulgated the PIA with the express purpose of providing the public "complete information about the affairs of government and the official acts of public officials and employees." Tex. Gov't Code Ann. § 552.001(a); *Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 293 (Tex. 2011) (citing *City of Garland*, 22 S.W.3d at 355–56); *Hart*, 382 S.W.3d at 591. The PIA is aimed at preserving a fundamental tenet of representative democracy: "that the government is the servant and not the master of the people." Tex. Gov't Code Ann. § 552.001(a); *Jackson*, 351 S.W.3d at 293. At its core, the PIA reflects the public policy that the people of Texas "insist on remaining informed so that they may retain control over the instruments they have created." Tex. Gov't Code Ann. § 552.001(a); *see Jackson*, 351 S.W.3d at 293 (citing *Texas Comptroller of Pub. Accounts v. Attorney Gen. of Tex.*, 354 S.W.3d 336, 343 (Tex. 2010)). To that end, the PIA directs that it be liberally construed in favor of disclosure of requested information. *See* Tex. Gov't Code Ann. § 552.001; *Jackson*, 352 S.W.3d at 293 (citing *City of Garland*, 22 S.W.3d at 356).

**GHP's assertion that it is not a "governmental body"**

Under the PIA, public information is available to all members of the public. *See* Tex. Gov't Code Ann. §§ 552.001, .021, .221(a). "Public information" is defined in the PIA as

6

"information that is collected, assembled, or maintained under a law or ordinance or in connection with the transaction of official business . . . by a governmental body." *Id*. § 552.002(a)(1). "Governmental body," in turn, is defined in part as "the part, section, or portion of an organization, corporation, commission, committee, institution, or agency that spends or that is supported in whole or in part by public funds." *See id.* § 552.003(1)(A)(xii). On appeal, GHP contends that the City of Houston's payments of public funds to GHP did not "support" GHP as required by this definition of "governmental body"; thus, our inquiry here turns largely on construction of the phrase "supported in whole or in part by public funds." *See id.*

Seeking the Legislature's intent first and foremost in the plain meaning of the PIA's words proves surprisingly troublesome in this context. As we recently noted in *Hart*, the meanings of the word "supported" are so broad and varied that any private entity that receives any public funds can be said to be, at least in part, "supported" by those public funds. *See Hart*, 382 S.W.3d at 591–92. Such an interpretation, however, would lead to absurd results in the context of the PIA: privately controlled and operated organizations would be subject to disclosure under the PIA simply because those organizations performed services or provided goods under bona fide government contracts. Surely the Legislature did not intend to extend PIA obligations to, for example, the vendor who sells paper to a governmental agency, even if the revenue from such sales entirely supported the vendor's business.[2]

---

[2] As we noted in *Hart*, the Texas Attorney General and the Fifth Circuit have agreed that simply receiving public funds does not make a private entity a "governmental body" under the PIA. *See Texas Ass'n of Appraisal Dists., Inc. v. Hart*, 382 S.W.3d 587, 593 (Tex. App.—Austin 2012, no pet.)

At the other end of the spectrum are arguments that "support" requires some magnitude of support from public funds not specified in the text of the PIA. The dissent would interpret the phrase in such a way as to not require public disclosure unless the entities receiving the public funds "were created or exist to carry out governmental functions and whose existence are maintained in whole or in part with public funds." Similarly, GHP argues that "support" should be construed to require that the receiving organization's existence or subsistence be based upon the receipt of public funds. While these suggested interpretations may seem reasonable in some contexts, we do not find support for them in the text of the PIA, which makes no mention of a requirement that public funds must be a vital component of the "existence" or "maintenance" of the outside entity. The Legislature could have, but did not, articulate a quantitative level to which public funds must "support" the entity in question before the public has the right to information about how public funds are being spent.[3] Further, interpreting the PIA in such a way would narrow the scope of the entities to which it applies, undermining the PIA's express purpose of providing the public with complete information about the affairs of government, which includes information regarding how public funds are expended. *See* Tex. Gov't Code Ann. § 552.001(providing that "it is the policy of this state that each person is entitled, unless otherwise expressly provided by law, at all times to complete information about the affairs of government and the official acts of public officials and employees"). For these reasons and as we held in *Hart*, we conclude here that the PIA's use

---

[3] While appellant argues on this record that disclosure should not be required because the public funds only make up a small portion of the entity's support, the Legislature provided that PIA disclosure applies only to "the part, section, or portion of an organization, corporation, commission, committee, institution, or agency that spends or that is supported in whole or in part by public funds." *See* Tex. Gov't Code Ann. § 552.003(1)(A)(xii) (West 2012) (defining "governmental body"). In the instant case, GHP has neither sought to segment its disclosure or established a record on which such a distinction could be made.

8

of the term "support" in the definition of a governmental entity is subject to more than one reasonable meaning.

When statutory text is ambiguous, we may resort to rules of construction or statutory aids, including deference to an administrative agency's construction of the statute if that construction is reasonable. *See Texas Citizens*, 336 S.W.3d at 624–25 (agency deference); *Entergy*, 282 S.W.3d at 437 (rules of construction and statutory aids). This deference is especially applicable here because the Legislature requires the Attorney General to determine whether records must be disclosed pursuant to the PIA. *See* Tex. Gov't Code Ann. § 552.306; *Abbott*, 109 S.W.3d at 121; *Rainbow*, 897 S.W.2d at 949; *see also Texas Citizens*, 336 S.W.3d at 624 (noting that we give "serious consideration" and "some deference" to agency's "interpretation of a statute it is charged with enforcing" so long as that construction "is reasonable and does not conflict with the statute's language").

Since 1988, Texas Attorney General opinions and open-records letter rulings addressing the definition of "governmental body" under section 552.003(1)(A)(xii) have relied heavily on the analytical framework supplied by the federal Fifth Circuit Court of Appeals in *Kneeland v. National Collegiate Athletic Ass'n*, 850 F.2d 224 (5th Cir. 1988). *See, e.g.*, Tex. Att'y Gen. Op. No. GA–0666 (2008); Tex. Att'y Gen. Op. No. GA–0603 (2008); Tex. Att'y Gen. OR2012–11220; Tex. Att'y Gen. OR2001–4849; Tex. Att'y Gen. LO–97–017 (1997). The Fifth Circuit created this framework by reviewing the Attorney General's pre–1988 opinions on this issue, analyzing whether a private entity receiving public funds is a "governmental body" for PIA purposes. *See Kneeland*, 850 F.2d at 228 (reviewing Tex. Att'y Gen. No. ORD 1, Tex. Att'y Gen. No. JM–821 (1987), Tex. Att'y Gen. No. ORD–228 (1979)). *Kneeland*'s reliance on and adherence

9

to Attorney General opinions makes it a useful framework for our analysis here. *See Abbott*, 109 S.W.3d at 121 (noting that deference to Attorney General is especially appropriate in PIA cases). While appellant and the dissent criticize *Kneeland*, we feel it provides a workable, though not perfect, framework for analyzing when a recipient of public funds should bear the obligation under the PIA to answer to the public as to how those funds are spent. More importantly, under principles of deference to agency action, it is a reasonable construction of "governmental body."

**The *Kneeland* test**

In *Kneeland*, the Fifth Circuit first noted that a private entity is not a "governmental body" under the PIA "'simply because [it] provides specific goods or services under a contract with a government body.'" *See Kneeland*, 850 F.2d at 228 (quoting Tex. Att'y Gen. No. ORD-1). It then described what it determined were the three fact situations in which the Attorney General had historically determined that a private entity receiving public funds was a "governmental body" subject to disclosure under the PIA. From those three fact situations come what is now referred to as the *Kneeland* test:

An entity receiving public funds is treated as a governmental body under the PIA—

1. ***unless*** the private entity's relationship with the government imposes a specific and definite obligation to provide a measurable amount of service in exchange for a certain amount of money as would be expected in a typical arms-length contract for services between a vendor and purchaser;

2. ***if*** the private entity's relationship with the government indicates a common purpose or objective or creates an agency-type relationship between the two; or

3. ***if*** the private entity's relationship with the government requires the private entity to provide services traditionally provided by governmental bodies.

*See id.* We agree with the Fifth Circuit's analysis of pre-1988 Attorney General opinions on this issue, but more importantly, the Attorney General agrees and has adopted the *Kneeland* analysis and framework as its own. Accordingly, we will analyze GHP's relationship with the City of Houston under the *Kneeland* framework as adopted by the Attorney General. *See Hart*, 382 S.W.3d at 593–94 (adopting *Kneeland* test).

1. ***Specific and definite obligation to provide a measurable amount of service***

The Attorney General has emphasized that *Kneeland*'s first inquiry is the primary consideration for determining whether a private entity is a governmental body. *See* Tex. Att'y Gen. No. GA-0666 (2008). This primary inquiry examines the obligation created by the relationship between the private entity and the governmental body. In this case, some of the provisions in the contract between GHP and the City of Houston impose specific and definite obligations on GHP to provide a measurable amount of service. For example, GHP must complete ten "signature events," which are defined as "outbound recruiting trips" and "inbound site consultant familiarization tours"; organize and promote the "State of the Airport luncheon"; support two outbound business-development missions; and provide the City of Houston with specific GHP membership benefits. But GHP's major obligations under the contract are not specific, definite, or tied to a measurable amount of service for a certain amount of money. For example, the contract requires GHP to—

- Identify new business opportunities, secure economic incentives and increase outreach and recruitment activities to the region's targeted key industries to strengthen the City of Houston as a competitive place to do business;

- partner with the airport system to recruit, relocate, and expand business which supports the master plan, and to identify business incentives available in both public and private sectors;

11

- make its research capabilities available to the City of Houston's convention and entertainment facilities department and its convention and visitor's bureau for marketing reports;

- support and coordinate with HAS to develop new air routes, stimulate increased international trade and business for Houston companies;

- promote HAS stories in international markets and highlight HAS efforts to provide airports allowance for expansion and ease of transportation;

- "coordinate on matters of mutual interest" before the U.S. Congress, federal agencies, the Texas Legislature, and Texas agencies; and

- assist the City of Houston's mayor, should she ask for help, with "advancing various Economic Development and Marketing Initiatives."

Although some of these seemingly aspirational provisions also list specific tasks to be performed in furtherance of the stated obligation, those tasks are not measurable or limited in any way. In other words, GHP may be required to perform additional, unlisted tasks in furtherance of its overall general aspirational obligations. Further, none of GHP's obligations under the contract are done in exchange for a certain amount of money; rather, GHP is paid the same amount on a quarterly basis regardless of whether or how much it does in furtherance of the contract's goals. To that extent the overall impression is that GHP's obligations under the contract with the City of Houston lack a definite structure. This is in contrast, for example, to a contract that requires an entity to provide measurable services, such as to clean state offices or provide office supplies to the governmental body in exchange for a certain amount of money.

GHP argues that it received public funds, not as support, but as a *quid pro quo* exchange for services. But even if this characterization is accurate, GHP's argument assumes that "support" can exist only in the absence of *quid pro quo.* We find no support in the PIA, the Attorney General opinions, or *Kneeland* for that proposition. Further, while *Kneeland* noted that the

12

organization's members had "received a *quid pro quo*, in sufficiently identifiable and measurable quantities of services, for any public fund expenditures," the focus was not on the *quid pro quo*, but on the fact that there was "sufficiently identifiable and measurable quantities of services." *See Kneeland*, 850 F.2d at 230.

In sum, we cannot say that overall the contract here imposes specific and definite obligations on GHP to provide a measurable amount of services to the City of Houston in exchange for a certain amount of money, as would be expected in a typical arms-length contract for services between a vendor and purchaser. Thus, we must conclude that GHP "is supported in whole or in part by public funds." *See* Tex. Att'y Gen. No. GA-0666.

### 2. *Common purpose or objective*

Even if GHP's relationship with the City of Houston did not meet the primary prong of the *Kneeland* test, it clearly meets the second prong—i.e., it indicates a common purpose or objective. The trial court specifically found that, "Under the contract, GHP and the City of Houston shared the common purpose or objective of economic development and promotion." The Houston contract obligates GHP to perform services for or on behalf of the City of Houston in support of the goals, visions, and objectives of GHP's Strategic Plan, which is, generally stated, directed at making the City of Houston attractive to companies and helping Houston companies sell their products and services overseas. Further, the contract obligates GHP to advocate for the City of Houston's federal and state legislative agendas and incorporate those agendas into GHP's agenda—i.e., GHP must make the City of Houston's legislative objectives its own.

GHP counters that it is not "supported" by public funds because there is no agency relationship between it and the City of Houston. We would note that the district court found

13

otherwise:  In a letter to the parties explaining its judgment, the district court explained that it found that there was an agency relationship based on several factors, including that GHP was required to replace any of its employees deemed unsatisfactory by the City of Houston or HAS; GHP had to execute a ten-year strategic plan identified by the Houston mayor; confidentiality was required by both parties; GHP had to manage the City of Houston's responsibilities with the Permanent Secretariat of the World Energy Cities Partnership;[4] and GHP had to coordinate on matters of mutual interest before various federal and state bodies.  The trial court also specifically found and concluded in its findings of fact and conclusions of law that, "Under the contract, an agency-type relationship was created between GHP and the City of Houston."  But even if we assume that there is no agency relationship here, this factor is only one element of the second prong of the *Kneeland* test and, importantly, is described as being in the alternative to a common purpose or objective:

> "[A] contract or relationship that involves public funds and that indicates a common purpose or objective *or* that creates an agency-type relationship between a private entity and a public entity will bring the private entity within . . . the definition of a 'governmental body.'"

*Kneeland*, 850 F.2d at 228 (quoting Tex. Att'y Gen. No. JM-821) (emphasis added).  Here, as described above, the contract and the relationship indicate common purposes.  For that reason, we need not address whether there is an agency relationship or GHP's complaint that no court or Attorney General opinion has explained how an agency relationship is relevant to our inquiry here.

---

[4]  The World Energy Cities Partnership is "a non-profit organization whose members are globally recognized as international energy capitals."  *See World Energy Cities Partnership*, http://www.energycities.org/about (last visited January 24, 2013).

Rather, based on the examples described above, we conclude that GHP's relationship with the City of Houston evidences common purposes and objectives sufficient to satisfy the second prong of the *Kneeland* test.

### 3. *Traditional government services*

The last prong of the *Kneeland* test asks if the private entity's relationship with the government requires the private entity to provide services traditionally provided by governmental bodies. Our review of the record shows at least three obligations that we consider responsive to this question. The first is GHP's obligation to take over the City of Houston's responsibilities as the Permanent Secretariat of the World Energy Cities Partnership. The second is GHP's ability to appoint its members to serve on HAS (Houston Airport System) task forces responsible for reviewing HAS's requests for proposal for airport concessions and services. And the third is GHP's obligation to execute a ten-year strategic plan identified in the "Mayor's Task Force Report on Economic Development." Further, the overall purpose of this contract involves the economic development of a metropolitan area, a task which itself is considered by some to be a function of the government. Thus, while perhaps not a large aspect of its obligations, GHP does take on duties that would be more traditionally tasked to governmental bodies.

Based on our determination that GHP's relationship with the City of Houston fails the primary prong of the *Kneeland* test—i.e., it does not impose a specific and definite obligation to provide a measurable amount of service in exchange for a certain amount of money as would be expected in a typical arms-length contract for services between a vendor and purchaser—in addition to the fact that GHP's relationship satisfies the other *Kneeland* factors, GHP is an entity that is

15

supported, in whole or in party by public funds. As such, we hold that GHP is a "governmental body" for purposes of the disclosure of public information under section 552.003 of the PIA.

We overrule GHP's first issue on appeal.

**Jurisdiction**

In its second issue, argued in the alternative, GHP asserts that we do not have jurisdiction over it in this case because GHP is not "presently" a governmental body under the PIA. Specifically, GHP argues that even if its 2007 and 2008 contracts with the City of Houston made it a "governmental body" under the PIA, those contracts, and thus GHP's relationship with the City of Houston, were modified after that time such that it can no longer be considered a "governmental body" under the PIA. As a result, GHP argues, the courts have no jurisdiction to order GHP to disclose its records because the PIA only gives the authority to direct current governmental bodies to disclose public records. Without addressing whether GHP's current relationship with the City of Houston makes it a "governmental body" under the PIA, we would simply note that the PIA makes public information available to the public and gives the courts the authority to order the disclosure of that public information. *See* Tex. Gov't Code Ann. §§ 552.021, .321, .3215. "Public information" is "information that is collected, assembled, or maintained . . . by a governmental body." *See* Tex. Gov't Code Ann. § 553.002(a)(1). GHP "collected, assembled, or maintained" information while it was, as we have determined it to be for PIA purposes, a governmental body in 2007 and 2008. That information is, therefore, public information subject to the PIA and, in turn, court-ordered disclosure. Interpreting the PIA's provisions to apply only to entities that can be considered governmental bodies at the time disclosure is ordered would defeat the PIA's overarching purpose of making public information available to the public. The fact that an entity can change or

16

try to change its nature should not make public information inaccessible to the public. Accordingly, we hold that the relevant inquiry here is not whether the entity is a governmental body at the time of the court-ordered disclosure, but rather whether the information sought is public information as defined by the PIA. We overrule GHP's second issue on appeal.

## CONCLUSION

Having overruled both of GHP's issues on appeal, we affirm the district court's judgment.

_____

Jeff Rose, Justice

Before Chief Justice Jones, Justices Pemberton and Rose;
    Dissenting Opinion by Chief Justice Jones

Affirmed

Filed:   January 31, 2013

17