# IN THE SUPREME COURT OF TEXAS

════════════

No. 13-0745

════════════

GREATER HOUSTON PARTNERSHIP, PETITIONER,

v.

KEN PAXTON, TEXAS ATTORNEY GENERAL; AND JIM JENKINS, RESPONDENTS.

════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

════════════════════════════════════════════════

**Argued March 25, 2015**

JUSTICE GUZMAN delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE LEHRMANN, JUSTICE DEVINE, and JUSTICE BROWN joined.

JUSTICE BOYD filed a dissenting opinion, in which JUSTICE JOHNSON and JUSTICE WILLETT joined.

The question presented here is whether a private entity operating like a chamber of commerce is a "governmental body" subject to public disclosure of its private business affairs under the Texas Public Information Act. In seeking to promote the public's legitimate interest in transparent government, the Act imposes considerable disclosure obligations on "governmental bod[ies]." Importantly, the statutory definition of "governmental body" extends only to "the part, section, or portion of an organization, corporation, commission, committee, institution, or agency that spends or *that is supported in whole or in part by public funds*." *See* TEX. GOV'T CODE § 552.003(1)(A)(xii) (emphasis added). This operates to prevent nominally private entities whose work might otherwise qualify them as de facto public agencies from circumventing the Act's

disclosure requirements. This case requires us to decide whether the term "supported" encompasses private entities contracting at arm's length with the government to provide general and specific services or whether the term properly includes only those entities that could not perform similar services without public funds and, are thus, sustained—in whole or part—by such funds.

When a private entity enters into a contract and receives government funds in exchange for its services, the entity's right to conduct its affairs confidentially may be in tension with the public's right to know how government funds are spent. Transparency, openness, and accountability in the government are all of fundamental importance. However, these important policy objectives cannot extinguish the privacy rights properly belonging to private business entities in Texas. By liberally authorizing public access to government records while simultaneously shielding private business from unwarranted interference, the Legislature carefully balanced these conflicting interests. Mindful of the delicate equilibrium between these equally compelling concerns, we conclude that the term "supported," which helps define the breadth of the Act, unambiguously includes only those entities at least partially sustained by public funding. Because the statutory language is unambiguous, we need not consider the accuracy or vitality of the test articulated in *Kneeland v. National Collegiate Athletic Ass'n*, 850 F.2d 224 (5th Cir. 1988), which the Attorney General's Open Records Division has traditionally applied to private entities in cases involving open-record requests.

Here, Greater Houston Partnership, a nonprofit corporation providing economic-development services to the City and other clients pursuant to quid pro quo contracts, contests whether it is a "governmental body" in whole or in part. Applying *Kneeland*, the Attorney General and lower courts held that it is. We hold, however, that Greater Houston Partnership is not a "governmental body" under the Texas Public Information Act because it is not wholly or partially sustained by

2

public funds; we therefore reverse the court of appeals' judgment and render judgment for Greater Houston Partnership.

## I. Factual and Procedural Background

Greater Houston Partnership (GHP) is a private, nonprofit corporation that promotes regional economic growth and an attractive business climate for a ten-county area centered around Houston, Texas. GHP's stated purpose is to enhance economic prosperity, facilitate business relocation and expansion, encourage international outreach initiatives, and provide strategic planning to advocate for "the improvement of commercial, industrial, agricultural, civic, and cultural affairs" in the Houston region. In furtherance of this objective, GHP provides consulting, event planning, and marketing services (including advertising and market research) to its roughly 2,100 member companies on a contractual basis. GHP also hosts numerous networking and professional development events, including several weekly GHP Council meetings on topics relevant to the regional economy. GHP operates on an annual budget of approximately $11.7 million, and these funds emanate primarily from membership revenue. In short, GHP functions much like thousands of chambers of commerce across the nation that promote municipal and regional economies.

Consistent with its business model, GHP contracted to provide consulting, event planning, and marketing services to the City of Houston, pursuant to an "Agreement for Professional Services." GHP and the City signed similar agreements annually for several years, including 2007 and 2008, the time periods at issue here. The contracts included a "Scope of Services" exhibit that delineated, under general headers, the specific services that GHP would provide to the City. Under these contracts, GHP received quarterly payments in arrears contingent upon the City's approval of performance reports detailing the particular services GHP provided in that quarter. If GHP failed

3

to deliver the contracted-for services to the City's satisfaction, the contracts authorized the City to pay GHP for the portion of services satisfactorily rendered. Notably, however, the two contracts differed in one significant respect: the 2008 contract expressly provided that "[n]othing in this Agreement shall be construed to imply that [GHP] is subject to the Texas Public Information Act."

The instant suit arose from a May 2008 request Houston-area resident Jim Jenkins submitted to GHP in which he sought "a copy of the check register for [GHP] for all checks issued for the year 2007." Jenkins grounded his request in the Texas Public Information Act (TPIA), claiming that "[p]ublic records show that [GHP] is an organization that spends or that is supported in whole or in part by public funds," and GHP is, therefore, "subject to the Public Information Act in the same manner as a governmental body." *See* TEX. GOV'T CODE § 552.003(1)(A)(xii) (defining "governmental body" for purposes of the TPIA).

GHP objected to Jenkin's request and did not disclose the information. GHP acknowledged it received public funds from the City but disagreed it qualified as a "governmental body" under the TPIA because the public funds were compensation for vendor services provided pursuant to an arm's-length contract with the City. The City's annual payments under the contract amounted to less than 8% of GHP's total annual revenue; member contributions, on the other hand, totaled more than 90% of its revenue. GHP further noted that of the roughly 2,100 companies that comprise its membership, only four could be described as governmental bodies. Refusing to disclose the requested information, GHP referred the matter to the Texas Attorney General as required under the TPIA. *See id.* §§ 552.301(a), .307.

In an informal letter ruling, the Attorney General's Open Records Division agreed with Jenkins, and concluded that GHP was a "governmental body" subject to the TPIA's disclosure

4

requirements—specifically with respect to the 2007 contract with the City.[1]  Tex. Att'y Gen. OR2008-16062; *see also* TEX. GOV'T CODE § 552.306.  In reaching this conclusion, the Attorney General determined that GHP's operations were "supported" by the City because: (1) GHP provided vague and indefinite services to the City aimed at advancing the City's overall economic development; (2) GHP and the City shared a common purpose and objective centered around the City's economy; and (3) GHP provided services traditionally supplied by the government.  Tex. Att'y Gen. OR2008-16062.

In response to the Attorney General's informal ruling, GHP filed a declaratory-judgment action against the Attorney General seeking a declaration that: (1) the Attorney General lacked jurisdiction over the dispute and (2) even if jurisdiction was proper, GHP was not a "governmental body" under the TPIA.  *See* TEX. GOV'T CODE §§ 552.3215(e), .321, .325(a).  Shortly after GHP filed suit, Jenkins filed an additional request seeking a copy of GHP's 2008 "disbursement registers and/or check registers," including the number, date, payee name, amount, and purpose.  Noting that GHP had already filed suit regarding the 2007 check-register request, the Attorney General closed the second request without a finding and directed the trial court to resolve the dispute.  Jenkins intervened in the lawsuit shortly thereafter.  *See id.* § 552.325 (authorizing a requestor to intervene in the suit).

After a bench trial, the trial court found GHP was a "governmental body" supported by public funds and ordered disclosure of the 2007 and 2008 check registers.[2]  The trial court determined that:

---

[1] GHP did not claim any exemptions from mandatory disclosure and only challenged that it is a governmental body subject to the TPIA in the first instance.

[2] The sole witness was Tracye McDaniel, GHP's executive vicepresident and chief operating officer. Documentary evidence included: six other contracts between GHP and other governmental bodies executed after 2008; the contracts between the City and GHP for fiscal years 2007, 2008, and 2009; GHP's Articles of Incorporation;

5

- GHP received public funds to provide economic development and promotion services for or on behalf of the City;

- GHP and the City shared the common purpose of economic development and promotion; and

- An agency-type relationship was created between GHP and the City of Houston.

The court of appeals agreed with the trial court and affirmed its judgment, albeit over a strongly worded dissent. 407 S.W.3d at 786, 787. Finding the phrase "supported in whole or in part by public funds" ambiguous, the lower court relied on an extra-textual analytical construct known as the *Kneeland* test to conclude GHP qualified as a governmental body under the TPIA.[3] *Id.* at 782-83. The dissent criticized the court's reliance on the *Kneeland* test, finding the statutory context unambiguously dictated only the narrow construction of "supported" as applied to a private entity. *Id.* at 788 (Jones, C.J., dissenting).

On appeal to this Court, GHP advances three principal reasons why it is not a "governmental body" under the TPIA. First, GHP contends the phrase "supported . . . by public funds" unambiguously excludes the City's payments to GHP. Second, even if the language is ambiguous, the Court should reject the *Kneeland* test because it is unclear and not grounded in the statutory

_____

Jenkins's requests for the 2007 and 2008 check registers; all four quarterly performance reports GHP submitted to the City in 2007; and performance reports GHP submitted to other governmental bodies in 2007 and 2010.

[3] Derived from a handful of nascent open-records rulings, the *Kneeland* test originated in a 1986 case considering whether the National Collegiate Athletic Association and Southwest Athletic Conference were "supported in whole or in part by public funds" under the TPIA's predecessor statute. *See Kneeland v. Nat'l Collegiate Athletic Ass'n*, 650 F. Supp. 1047 (W.D. Tex. 1986), *rev'd*, 850 F.2d 224 (5th Cir. 1988). "Finding no dispositive Texas jurisprudence on this issue," the Fifth Circuit "closely examine[d] the opinions of the Texas Attorney General" and discovered "helpful signs, albeit mixed signals, in the [Attorney General] opinions." *Id*. at 228. Despite a rather tepid endorsement, and without considering the statutory language, the court identified and applied "three distinct patterns of analysis in opinions interpreting [the funding-source element] of the Act" to private entities. *Id*. Those "patterns of analysis" provided the foundation for what became the three-pronged *Kneeland* test.

6

language. Third, GHP argues it is not "supported . . . by public funds" even under the *Kneeland* test. The Attorney General disputes all three points. First, it contends that GHP plainly qualifies as a "governmental body" under the TPIA; limiting the statute's reach to entities that exist solely to carry out government functions would frustrate its purpose of openness, and GHP is "supported" by public funds. Second, the *Kneeland* test is not only the relevant framework in which to evaluate the TPIA's application to otherwise private entities, the Legislature has effectively endorsed the *Kneeland* test.[4] Third, the court of appeals properly applied the three *Kneeland* elements to GHP, a "governmental body" subject to regulation under the TPIA.

We granted GHP's petition for review to determine the proper scope of the funding source element of the TPIA's "governmental body" definition.

## II. Discussion

### A. Background Law

The Legislature enacted the Texas Open Records Act in 1973 to increase government transparency in the wake of public scandals, including a massive stock-fraud imbroglio known as the Sharpstown scandal.[5] In 1993, the Open Records Act was recodified without substantive revision

---

[4] The Legislature has amended the TPIA several times without materially altering the funding-source element of the "governmental body" definition. *See* Act of May 29, 1995, 74th Leg., R.S., ch. 1035, § 2, 1995 Tex. Gen. Laws 5127, 5128; *see also* Act of May 20, 1991, 72nd Leg., R.S., ch. 306, § 5, 1991 Tex. Gen. Laws 1340, 1341-42; Act of May 17, 2001, 77th Leg., R.S., ch. 633, § 2, 2001 Tex. Gen. Laws 1194, 1194-95; Act of April 23, 1999, 76th Leg., R.S., ch. 62, § 18.24, 1999 Tex. Gen. Laws 127, 403; Act of May 24, 2001, 77th Leg., R.S., ch. 1004, § 2, 2001 Tex. Gen. Laws 2186, 2187; Act of May 20, 2003, 78th Leg., R.S., ch. 1276, § 9.014, 2003 Tex. Gen. Laws 4158, 4218.

[5] *See* Act of May 19, 1973, 63rd Leg., R.S., ch. 424, § 1-16, 1973 Tex. Gen. Laws 1112, 1112-18 (codified at TEX. REV. CIV. STAT. art. 6252-17a); *see generally Mutscher v. State*, 514 S.W.2d 905, 910-11 (Tex. Crim. App. 1974) (summarizing events of Sharpstown scandal).

7

as the Texas Public Information Act.[6] Currently codified in Chapter 552 of the Texas Government Code, the TPIA's stated policy objectives are to provide accountability and transparency in government by establishing mechanisms to foster public access to government records. *See* TEX. GOV'T CODE §§ 552.001-.353. Importantly, an entity's disclosure obligations under the TPIA hinge on whether it is in fact a "governmental body."

The TPIA defines a "governmental body" as one of twelve different types of entities. *See id.* § 552.003(1)(A). Most of the entities listed in section 552.003(1)(A) are identified quite precisely; for example, a "school district board of trustees" is statutorily defined as a "governmental body." *Id.* § 552.003(1)(A)(v). Others are more amorphous, including the section at issue here, which subjects "the part, section, or portion of an organization, corporation, commission, committee, institution, or agency that spends or that is supported in whole or in part by public funds" to the TPIA. *Id.* § 552.003(1)(A)(xii). The crux of our inquiry in this case is the meaning of "supported in whole or in part by public funds." The proper scope of this phrase is significant because the consequences of being characterized as a governmental body are considerable. The most obvious is that under section 552.221 of the Texas Government Code, a "governmental body" must promptly produce "public information" on request unless an exemption from disclosure applies and is timely asserted.[7] *See id.* §§ 552.101-.123, .221; *see also Tex. Comptroller of Pub. Accounts v. Att'y Gen.*

---

[6] Act of May 4, 1993, 73rd Leg., R.S., ch. 268, § 1, 1993 Tex. Gen. Laws 583, 986 (codified at TEX. GOV'T CODE §§ 552.001-.353).

[7] To claim an exemption, a governmental body must, within ten business days after receiving a request, submit a written statement to the Attorney General explaining why the information should be withheld and request an Attorney General opinion. TEX. GOV'T CODE § 552.301(a), (b). If the Attorney General rules that the Act does not exempt the information from required disclosure, the governmental body must make it available to the requesting party or seek a judicial determination that the information does not have to be disclosed. *Id.* §§ 552.3215(e), .324, .325(a); *see also City of Garland v. Dall. Morning News*, 22 S.W.3d 351, 356 (Tex. 2000). If the governmental body refuses to disclose the requested information, the Attorney General may seek to compel disclosure through a mandamus proceeding. TEX.

*of Tex.*, 354 S.W.3d 336, 341-48 (Tex. 2010) (construing an exemption under the TPIA). The term "public information" broadly includes "information that is collected, assembled, or maintained under a law or ordinance or in connection with the transaction of official business" either: (1) "by a governmental body" or (2) "for a governmental body and the governmental body owns the information or has a right of access to it." TEX. GOV'T CODE § 552.002(a).

## B. Statutory Construction

GHP argues that as a private entity, it is not subject to the TPIA's disclosure requirements because it does not qualify as a "governmental body" under the statute's plain language. GHP therefore contends that it is entitled to seek the privacy protections typically afforded to non-governmental entities. Determining whether GHP is a "governmental body" whose records are subject to disclosure under the TPIA presents a matter of statutory construction that we review de novo. *City of Garland v. Dall. Morning News*, 22 S.W.3d 351, 357 (Tex. 2000). When interpreting a statute, our primary objective is to ascertain and give effect to the Legislature's intent without unduly restricting or expanding the Act's scope. *City of Lorena v. BMTP Holdings, L.P.*, 409 S.W.3d 634, 641 (Tex. 2013). We seek that intent first and foremost in the plain meaning of the text. *Id.*; *see also Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010). "Undefined terms in a statute are typically given their ordinary meaning, but if a different or more precise definition is apparent from the term's use in the context of the statute, we apply that meaning." *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). "However, we will not give an undefined term a meaning that is out of harmony or inconsistent with other terms

GOV'T CODE § 552.321.

in the statute." *State v. $1,760.00 in U.S. Currency*, 406 S.W.3d 177, 180 (Tex. 2013). Therefore, even if an undefined term has multiple meanings, we recognize and apply only the meanings that are consistent with the statutory scheme as a whole. *Id.* at 180-81. We only resort to rules of construction or extrinsic aids when a statute's words are ambiguous. *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009). Finally, in construing the TPIA, we are mindful of the legislative mandate that the TPIA be "liberally construed in favor of granting a request for information." TEX. GOV'T CODE § 552.001(b).

As an initial matter, we observe the parties' agreement that GHP is a "governmental body" only if it, or a "part, section, or portion" of it "is supported in whole or in part by public funds." It is likewise undisputed that GHP receives "public funds."[8] The parties disagree, however, on the meaning and application of the statutory phrase, "supported in whole or in part by." GHP argues that the TPIA cannot reasonably be interpreted to apply to privately-controlled corporations that perform services under quid pro quo government contracts. According to GHP, the Legislature unambiguously intended "supported in whole or in part by public funds" to identify entities that were created or exist to carry out government functions and whose existence are maintained in whole or in part with public funds. Conversely, the Attorney General declares the statutory language ambiguous because it could reasonably be read to apply to any contract between the government and a private entity. We agree with GHP.

"Supported" is an undefined term with multiple and varied dictionary definitions. However, only two of the definitions are even remotely possible as applied to the TPIA and only one of those

---

[8] "Public funds" refers to the "funds of the state or of a governmental subdivision of the state." TEX. GOV'T CODE § 552.003(5).

definitions is reasonable when the statute is considered as a whole. Reading the definition of "governmental body" in its contextual environment—as we are bound to do—reveals that the TPIA applies only to entities acting as the functional equivalent of a governmental body that are "sustained" at least in part, by public funds. In reaching this conclusion, we remain ever mindful of the statute's liberal-construction clause. But liberal-construction objectives do not permit a construction of the Act untethered from its statutory moorings.

Familiar interpretive guides and established canons of construction inform our reading of section 552.003(1)(A)(xii). In determining the meaning of "supported . . . by public funds," we begin, as we must, with the statute's plain language. *Tex. Lottery Comm'n*, 325 S.W.3d at 635. Common English words frequently have a number of dictionary definitions, some quite abstruse and esoteric, others more comprehensible and commonplace. *See, e.g.*, *$1,760.00 in U.S. Currency*, 406 S.W.3d at 180-81 (noting that "novelty" has multiple dictionary definitions). Not surprisingly, "supported," the key term here, is subject to at least six disparate definitions in its verb form alone, with many of those including more nuanced sub-definitions. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 2297 (2002). By reading the term in context, however, we can narrow the universe of possible definitions to the most apposite. *See TGS-NOPEC Geophysical Co.*, 340 S.W.3d at 439.

As always, we are cognizant of the "fundamental principle of statutory construction and indeed of language itself that words' meanings cannot be determined in isolation but must be drawn from the context in which they are used." *Id.* at 441. We must therefore analyze the reasonableness of each definition in light of the statutory context. *See Jaster v. Comet II Const., Inc.*, 438 S.W.3d 556, 562 (Tex. 2014); *see also R.R. Comm'n v. Tex. Citizens for a Safe Future & Clean Water*, 336

11

S.W.3d 619, 628 (Tex. 2011) ("We generally avoid construing individual provisions of a statute in isolation from the statute as a whole."). The statute's first contextual clue emerges from the words immediately surrounding "supported." To avoid disharmony with the rest of the statute, "supported" must bear reference to "public funds," so it is clear that non-monetary definitions of "supported" make little sense in context. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 921 (2002) (defining "funds" as "available pecuniary resources"). Applying this limitation, we winnow the field down to two potential meanings for "supported," both of which are faithful to the statutory context:

> (1) to pay the costs of: maintain; to supply with the means of maintenance (as lodging, food or clothing) or to earn or furnish funds for maintaining; or

> (2) to provide a basis for the existence or subsistence of: serve as the source of material or immaterial supply, nourishment, provender, fuel, raw material, or sustenance of.

*See* WEBSTER'S THIRD NEW INT'L DICTIONARY 2297 (2002); *accord* BLACK'S LAW DICTIONARY 1668 (10th ed. 2009) (defining the term "support" to mean "[s]ustenance or maintenance"). In statutory context, "supported" must thus mean sustenance, maintenance, or both.

Another contextual clue derives from the Act's purpose. The statutory context indicates that all section 552.001(a) entities are either the government or its functional equivalent. First, the statute provides the public with "complete information about the affairs of government and the official acts of public officials and employees." TEX. GOV'T CODE § 552.001(a). The stated purpose of permitting access to this information is to allow the public to "retain control over the instruments they have created." *Id.* A reasonable definition of "supported" must be compatible with this stated purpose. The statute also specially defines the term "governmental body." In defining that term, the Legislature carefully omitted any broad reference to private entities, instead including private entities

12

insofar as they are "supported . . . by public funds." *Compare id.*, *with* FLA. STAT. § 119.011(2). In light of this omission, which we presume the Legislature purposefully selected, the scope of the term "governmental body," as applied to private entities, must be filtered through the Act's purpose and function of allowing access to instrumentalities of government. Thus, the Act only applies to private entities acting as the functional equivalent of the government. *See TGS-NOPEC Geophysical Co.*, 340 S.W.3d at 439.

Defining "supported" to mean "maintenance" is untenable because doing so risks sweeping any private entity that received any public funds within the definition of a "governmental body." *See* 407 S.W.3d at 781 (citing *Tex. Ass'n of Appraisal Dists., Inc. v. Hart*, 382 S.W.3d 587, 591-92 (Tex. App.—Austin 2012, no pet.)). To resurrect the example provided by the court of appeals, if we equate "supported" with supplying an entity with a means by which the entity can pay for necessities, then even a paper vendor with hundreds of clients would qualify as a "governmental body" merely by virtue of getting paid for selling office supplies to a single state office. *See* 407 S.W.3d at 781. Every company must expend funds to stay in business; it would be impossible to conclude that any business compensated for providing goods or services to a governmental entity pursuant to a quid pro quo contract was not using public funds to pay for necessities. Thus, any entity doing business with the government would be a "governmental body."

"Quid pro quo" means "[a]n action or thing that is exchanged for another action or thing of more or less equal value." *See* BLACK'S LAW DICTIONARY 1443 (10th ed. 2009). As the dissent agrees, the Legislature did not intend for the statute to reach entities involved in quid pro quo transactions with the government, and it is undisputed that a fair reading of the statute cannot

13

countenance such a result.  407 S.W.3d at 789.  We reject any reading of "supported" that would injudiciously apply public transparency laws to private businesses merely because they receive public funds under a contract with the government.  Accordingly, the "maintenance" definition of "supported" is not textually viable.

In contrast, defining "supported" as "sustenance" ensures that only an entity, or its "part, section or portion," whose existence is predicated on the continued receipt of government funds would qualify as a "governmental body."  Among the meanings of "sustain" are "to cause to continue; to keep up; to carry or withstand; to nourish; to prevent from sinking or giving way." *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 2304 (2002); *see also* BLACK'S LAW DICTIONARY 1676 (10th ed. 2009) (defining "sustain" to mean "to nourish and encourage").  Applying this construction, the universe of private entities constituting governmental bodies is obviously more circumscribed because only a small segment of private entities could fairly be considered to be sustained by the government.  To be "sustained" by public funds suggests the existence of a financially dependent relationship between the governmental body and a private entity or its subdivision redolent of that between a parent and child or principal and agent.  Financial dependency need not be absolute, however.  Rather, the government could be one of several contributing sources.  But sustenance implies that if the government ceased to provide financial support, the entity would be unable to meet its financial obligations.  Unquestionably, a private entity would qualify under a financially dependent construction of "supported" if it could not pursue its mission and objectives without the receipt of public funds, even if that funding only partially financed the entity's endeavors.  In short, an entity "supported" by public funds would not just receive government funds; it would require

14

them to operate in whole or in part.[9]  If we construe "supported . . . by public funds" in this manner, we must conclude GHP is not "supported" by public funds because it receives only a small portion of its revenue from government contracts.  And even if these government contracts were eliminated, it could continue to operate given the substantial revenue derived from other non-governmental sources.  Moreover, GHP could and would continue to promote the greater Houston economy to advance its own interests and those of its more than 2,000 non-government members.  GHP, in sum, does not require public funds and thus, is not sustained by public funds.

Because only one definition fits the statutory context, we conclude that "supported . . . by public funds" must be appropriately defined to only include those entities "sustained" by public funds—thereby ensuring that the statute encompasses only those private entities dependent on the public fisc to operate as a going concern.  Although not dispositive, our conclusion is reinforced by the fact that this construction of the term "supported" is consistent with the scope and nature of the eleven other types of entities more clearly described as a "governmental body" in the same provision. *See* TEX. GOV'T CODE § 552.003(1)(A).  The canon of statutory construction known as *noscitur a sociis*—"it is known by its associates"—holds that the meaning of a word or phrase, especially one in a list, should be known by the words immediately surrounding it. *See TGS-NOPEC Geophysical Co.*, 340 S.W.3d at 441.  We rely on this principle to avoid ascribing to one word a meaning so broad that it is incommensurate with the statutory context.  Accordingly, in evaluating the breadth of "supported in whole or in part by public funds," we may consider the scope of the enumerated

---

[9] It is possible, of course, that a portion of a private entity could be sustained by public funds even where the private entity, as a whole, is not.  In such instances, if the department or division is sustained by public funds, the division may be subject to the TPIA's disclosure obligations.  Here, GHP did not segregate funds, and it argued that such segregation would be logistically impossible.

categories preceding it. *See Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 750-51 (Tex. 2006). Of the eleven other examples of a "governmental body" listed in the statutory definition of the term, two stand out as arguably the most analogous to a private nonprofit like GHP. Thus, we briefly consider each in comparison.

First, the statute expressly identifies as a "governmental body" the governing board of a nonprofit water supply or wastewater service corporation that is organized under Chapter 67 of the Texas Water Code and exempt from ad valorem taxation under the Texas Tax Code. *See* TEX. GOV'T CODE § 552.003(1)(A)(ix). A nonprofit corporation of this type is authorized to engage in several traditional governmental functions, such as the right to build and operate water- and waste-treatment facilities and sell water to political subdivisions, private entities, or individuals. *See* TEX. WATER CODE § 67.002. Additionally, depending on the size of the county it serves, a nonprofit water or waste-water service provider may even establish and enforce "customer water conservation practices" through the assessment of "reasonable penalties as provided in the corporation's tariff." *See id.* § 67.011(a)(5), (b). By virtue of their special powers and privileges, these nonprofit utility operators essentially function as quasi-public corporations servicing the public. *See Garwood Irr. Co. v. Williams*, 243 S.W.2d 453, 456 (Tex. Civ. App.—Galveston 1951, writ ref'd n.r.e.).

The second potentially private "governmental body" identified in the statute is a nonprofit corporation eligible to receive federal funding, in the form of block grants, for anti-poverty programs at the state level. TEX. GOV'T CODE § 552.003(1)(A)(xi). Under this federal initiative, a nonprofit may receive funds if it demonstrates "expertise in providing training to individuals and organizations on methods of effectively addressing the needs of low-income families and communities" through

16

a detailed application process.[10]  42 U.S.C. § 9913(c)(2) (2012); *see also* OFFICE OF CMTY. SERVS., U.S. DEP'T OF HEALTH & HUMAN SERVS., COMMUNITY SERVICES BLOCK GRANT STATE AND ELIGIBLE ENTITY TECHNICAL ASSISTANT SERVICES 16-17(2015) (listing eligibility requirements).[11] A section 552.003(i)(A)(xi) "governmental body" must be "authorized by this state to serve a geographic area of the state." *See* TEX. GOV'T CODE § 552.003(1)(A)(xi).  This requirement presupposes that the nonprofit has a close working relationship with the state government. *See* 10 TEX. ADMIN. CODE § 5.211 (requiring an authorized nonprofit to submit monthly performance reports to the state agency monitoring the program).

The foregoing examples describe ostensibly private entities deputized by the government to provide services traditionally considered governmental prerogatives or responsibilities.  Thus, although nominally private, each is in fact acting as a quasi-public entity performing a core governmental function.  There is a significant difference between an entity of this nature and one like GHP, and our construction of "supported in whole or in part by public funds" reflects as much by capturing only those entities acting as the functional equivalent of the government. *See Fiess*, 202 S.W.3d at 751.

Our construction of the term "supported" remains faithful to the TPIA's liberal-construction clause. *See* TEX. GOV'T CODE § 552.001(b) ("This chapter shall be liberally construed in favor of granting a request for information.").  We have consistently recognized this clause expresses an important statement of legislative purpose, and we continue to adhere to it today. *See, e.g.*, *City of*

---

[10]  The federal program is codified at 42 U.S.C. §§ 9901-9926 (2012) and is administered by the U.S. Department of Health and Human Services Office of Community Service. *See* 42 U.S.C. § 9912 (2012).

[11]  Available at http://www.acf.hhs.gov/grants/open/foa/files/ HHS-2015-ACF-OCS-ET-1007_1.pdf.

*Garland*, 22 S.W.3d at 364 ("Unlike the [Freedom of Information Act], our Act contains a strong statement of public policy favoring public access to governmental information and a statutory mandate to construe the Act to implement that policy and to construe it in favor of granting a request for information."). Still, even a liberal construction must remain grounded in the statute's language and cannot overwhelm contextual indicators limiting public intrusion into the private affairs of non-governmental entities.[12]

In sum, we define "supported in whole or in part by public funds" to include only those private entities or their sub-parts sustained, at least in part, by public funds, meaning they could not perform the same or similar services without the public funds. If GHP (as a private entity that receives government funds even while not being supported by them) presents the hard case, entities on the ends of the spectrum—those that receive no government money, and those that receive only government money—will obviously present much more straightforward questions. Determining whether a partially funded entity qualifies as a "governmental body" will likely require case-specific analysis and a close examination of the facts. Nonetheless, we recognize as a general proposition that an entity, like GHP, that does not depend on any particular revenue source to survive—public or private—is not sustained even in part by government funds.

---

[12] There is little to support the view that open-records laws were envisioned as tools to pry open the sensitive records of private entities or to function as a private discovery tool. *See N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978) (describing the Freedom of Information Act). Instead, we have recognized:

> The Texas Legislature promulgated the TPIA with the express purpose of providing the public "complete information about the affairs of government and the official acts of public officials and employees." The Act is aimed at preserving a fundamental tenet of representative democracy: "that the government is the servant and not the master of the people." At its core, the TPIA reflects the public policy that the people of Texas "insist on remaining informed so that they may retain control over the instruments they have created."

*Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 293 (Tex. 2011) (citations omitted).

18

## C. Other Jurisdictions

While our construction of the TPIA is supported by a plain-meaning reading of the statute, an examination of similar open-records statutes from other jurisdictions is also instructive. In states where open-records acts apply to entities "supported in whole or in part by public funds," our sister courts have unanimously construed the phrase to exclude, as a general matter, private entities receiving public funds pursuant to quid pro quo agreements without regard to whether such an agreement is the entity's only funding source. *See, e.g.*, *Indianapolis Convention & Visitors Ass'n, Inc. v. Indianapolis Newspapers*, *Inc.*, 577 N.E.2d 208, 214 (Ind. 1991) ("In situations involving a *quid pro quo*, that is, measured goods or services given in exchange for payment based on identifiable quantities of goods or services, a private entity would not be transformed into a public entity because it would not be maintained and supported by public funds."); *Weston v. Carolina Research & Dev. Found.*, 401 S.E.2d 161, 165 (S.C. 1991) ("[T]his decision does not mean that the [open-records act] would apply to business enterprises that receive payment from public bodies in return for supplying specific goods or services on an arms length basis."); *Adams Cnty. Record v. Greater N.D. Ass'n*, 529 N.W.2d 830, 836 (N.D. 1995) ("When there is a bargained-for exchange of value, a *quid pro quo*, the entity is not supported by public funds."). Additionally, even in those states whose open-records acts fail to define "governmental body" or an equivalent term, our sister courts still narrowly construe the statute to include only private entities that have a relationship so intertwined with the government that they are the "functional equivalent of a governmental agency." *Memphis Publ'g Co. v. Cherokee Children & Family Servs., Inc.*, 87 S.W.3d 67, 78-79 (Tenn. 2002); *see also State ex rel. Oriana House, Inc. v. Montgomery*, 854 N.E.2d 193, 198-99 (Ohio 2006).

Recognizing the right of private businesses to conduct their affairs autonomously, at least one court has adopted a presumption that a private entity is not subject to an open-records request absent clear and convincing evidence that the private entity is the functional equivalent of a governmental body. *See, e.g.*, *State ex rel Oriana House, Inc.*, 854 N.E.2d at 200. In Florida, the only state whose statute expressly includes private entities, the Florida Supreme Court narrowly interpreted its open-records act to exclude private entities merely providing professional services to a governmental body. *See News & Sun-Sentinel Co. v. Schwab, Twitty & Hanser Architectural Group, Inc.*, 596 So. 2d 1029, 1031 (Fla. 1992) (construing FLA. STAT. § 119.011(2)). In fact, of those states with similar statutes, we have not encountered one that has construed an open-records act to include a private entity providing specific and measurable vendor services to a governmental body, even if that entity receives public funds. We find it difficult to ignore this interpretative uniformity, especially considering the gravitas of the interests at stake.

Our plain-meaning construction also comports with federal precedent interpreting the federal analogue—the Freedom of Information Act (FOIA). *See Tex. Comptroller of Pub. Accounts*, 354 S.W.3d at 342 (noting that because the Legislature modeled the TPIA on the FOIA, federal precedent is persuasive in construing the Act). Under the FOIA, "agency," the federal equivalent of "governmental body," is defined to include:

> any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency.

5 U.S.C. § 552(f)(1) (2012). In interpreting this broad language, the United States Supreme Court

held that a private entity receiving federal funding is considered a "government controlled corporation" and subject to FOIA disclosure requirements only if the private entity is also subjected to "extensive, detailed, and virtually day-to-day supervision" by the government. *Forsham v. Harris*, 445 U.S. 169, 180 (1980). The federal supervision must be "substantial . . . and not just the exercise of regulatory authority necessary to assure compliance with the goals of the federal grant." *Id.* at 180 n.11. Thus, narrowly defining "supported in whole or in part by public funds" under Texas law is consistent with the approach of other jurisdictions featuring similar acts and the United States Supreme Court's interpretation of the federal act on which the TPIA is based.

## D. Response to the Dissent

We briefly address some of the contentions in the dissenting opinion. Regarding statutory construction, there is little disagreement about the guiding principles and relevant canons involved here, and we agree, of course, that the canon of *noscitur a sociis* "cannot be used to render express statutory language meaningless." Slip Op. at 27 (Boyd, J., dissenting). We disagree as to the proper implementation of the canon, however. The dissent asserts that the first eleven definitions of "governmental body" in the TPIA should be cabined off from the twelfth definition of that term because the twelfth definition "uses specific language, inherently different than the language of the other definitions." *Id.* at 27. The dissent, thus, argues that the nature of the first eleven definitions cannot inform the twelfth. We disagree. All twelve are definitions of governmental bodies, and given that the twelfth definition is the most open-ended, blinders would be required to construe it in isolation from its statutory predecessors. Separating the definitions in this way would not only be artificial, it would also deprive us of a key source of insight into the parameters of the more

21

expansive twelfth definition.

More significant, however, is the dissent's suggestion that the statute is ambiguous. The dissent, building on this imprudent reading, would look to Attorney General decisions and the *Kneeland* test for "further guidance." *Id.* at 31. In canvassing the landscape of informal Attorney General rulings and divining instruction therefrom, the dissent resurrects *Kneeland*'s questionable methodology, which did the same. And as that court itself noted, even if "[o]ne may have no quarrel with the formulae," "the direction given is a mite uncertain." *Kneeland*, 850 F.2d at 228. The dissent finds *Kneeland* "persuasive" but we do not reach that analysis because of our determination that the statutory language unambiguously excludes GHP from qualifying as a "governmental body." Nonetheless, we think it worth brief pause to note *Kneeland*'s questionable foundation, as it—along with the raft of informal Attorney General rulings that bookend the decision—constitute the "forty years of legal interpretations" that we supposedly ignore in today's opinion.[13] Slip Op. at 3 (Boyd, J., dissenting). But many of these rulings were informal and, as such lack any precedential value. Put simply, the weight of this legal authority is considerably less august than the dissent's formulation implies.

While the dissent purports to rehabilitate *Kneeland*, its revised test is at best a partial improvement. The revised test makes it virtually impossible for an entity that provides intangible deliverables, such as consulting, advertising, or legal services, to satisfy the "specific and measurable

---

[13] The *Kneeland* test gained prominence by happenstance rather than design. It derived from a single federal district court opinion based on five conclusory Attorney General opinions written without any attempt to construe the statutory language. After *Kneeland* issued, the Attorney General adopted the test without further analysis. Thereafter, the lower courts used the *Kneeland* test out of deference to the Attorney General, also without scrutinizing the test in light of the statutory text and legislative intent embodied therein. We decline to defer to a test created without consideration of the statutory language.

services" prong of the test. The dissent portrays GHP as sharing only broad, amorphous goals with the City. Yet, the "broad" contract language referenced by the dissent actually refers to GHP's more general overarching objectives (essentially, these statements of objectives function as titles under which specific obligations of the contract are delineated). Each broad objective is followed by a list of specific services GHP promised to provide to achieve those objectives. For example, GHP was hired "to identify new business opportunities, secure economic incentives and increase outreach and recruitment activities to the region's targeted key industries to strengthen the City of Houston as a competitive place to do business." In furtherance of that objective, GHP is contractually obligated to develop business relationships with the top twenty-five companies not currently headquartered in the City; create and implement a business-retention program to provide quick responses to companies in the City; and arrange and host ten recruiting trips, or "Signature Events," for Houston-based executives to visit target companies and pitch them on the City's business advantages. These services are specific and measurable and are the sort of quid pro quo exchanges typical of a vendor services contract in that industry.

Thus, we do not believe that the monetary payments due to GHP under the 2007 and 2008 agreements are "general or unrestricted payment[s] provided to subsidize or underwrite the entity's activities" rather than "specific measurable services." *Id.* at 34. Even the dissent admits that some—but not all—of GHP's activities qualify as "specific measurable services," so the disagreement here is more a matter of degree than anything else.

The dissent's revised test would also require that "the funds be intended to promote a purpose, interest, or mission that the governmental and private entities share and would both pursue

23

even in the absence of their contractual relationship." *Id.* at 36. The dissent posits that a law firm may share a broad goal with a client, but the firm's interest remains "transaction specific" in a way that GHP's engagement is not. *Id.* at 38. At the risk of quibbling, we dispute that this metaphorical dividing line is nearly that clear or marked. Many law firms are hired not merely for a specific litigation matter but rather to provide more enduring and wide-ranging counsel. And more importantly, while the dissent takes for granted that GHP and the City's interests are perfectly aligned (and presumably always will be), that assumption is debatable. For instance, although the vast majority of cities presumably welcome financial investment, growth can prove politically divisive—just witness the debates over gentrification that grip many major cities experiencing explosive economic expansion. Regardless, the point is that GHP is hardly the auxiliary and mirror of the City that the dissent portrays it to be, and the proposed revision of the *Kneeland* test will not significantly clarify this confused area of the law.

The dissent also contends that "the Court writes the words 'in part' completely out of the statutory definition." *Id.* at 21. Nothing so drastic is occurring here. The statute's "in part" language may envision a multi-division entity that does business with the government, but not uniformly and not across all units. For instance, one can conceptualize a subdivision of a large corporation wholly funded by government contracts; nevertheless, because the subdivision is only a small part of the large organization, the government business forms a relatively small portion of the corporation's total revenue. In this scenario, the organization may be said to be supported "in part" by public funds. Moreover, there may be more overlap between "in part" and the neighboring statutory language than the dissent allows. While we generally attempt to avoid treating statutory language as surplusage, "there are times when redundancies are precisely what the Legislature

24

intended." *In re Estate of Nash*, 220 S.W.3d 914, 917-18 (Tex. 2007); *see also In re City of Georgetown*, 53 S.W.3d 328, 336 (Tex. 2001) (noting that statutory redundancies may mean that "the Legislature repeated itself out of an abundance of caution, for emphasis, or both"). Regardless of whether such drafting caution is at work here, the point remains that there are a host of possible explanations addressing the dissent's concerns.

### III. Conclusion

Amidst all the argument attempting to classify GHP as a governmental body, it is worth recalling precisely what GHP is not: GHP is not a government agency, nor is it a quasi-public agency specifically listed under the Texas Government Code as a "governmental body." GHP does not rely on its government contracts to sustain itself as a going concern; as all parties acknowledge, the government funds it receives constitute a relatively minuscule portion of GHP's annual budget. The only way GHP can qualify as a "governmental body," then, is if it can be said to be "supported in whole or in part by public funds."

GHP, like countless chambers of commerce nationwide, provides marketing, consulting, and event-planning services to the City and other clients pursuant to quid pro quo contracts. Like the lobbying shops and law firms that also populate the State payroll, GHP shares many common objectives with the City, but without more, such shared interests can hardly transform a service provider into a government appendage. A private entity engaged in economically delicate work should not be subjected to invasive disclosure requirements merely because it counts the government as one client among many. Transparency is a real concern, to be sure, and the TPIA's liberal-construction mandate reflects the depth of this interest. But liberal construction is not tantamount

25

to boundless reach. Yet, even if not directly subject to disclosure obligations under the TPIA, GHP's transactions with the government are hardly in a black box; the City—which is indisputably a "governmental body"—must disclose information regarding its contractors, including GHP.

Applying the TPIA's plain and unambiguous language, we hold that GHP is not "supported in whole or in part by public funds" and thus is not a "governmental body" under the TPIA. Because the relevant provisions of the TPIA are unambiguous, we do not apply the analysis outlined in *Kneeland v. National Collegiate Athletic Ass'n*, 850 F.2d 224 (5th Cir. 1986), nor any other extra-textual construct. We therefore reverse the court of appeals' judgment and render judgment for Greater Houston Partnership.

_____

Eva M. Guzman
Justice

OPINION DELIVERED: June 26, 2015

26